IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

STARKE A. HAWKINS,              )
                               )
            Petitioner,        )
                               )
      v.                       )          CV 114-130
                               )           (Formerly CR 112-185)
UNITED STATES OF AMERICA,       )
                               )
            Respondent.         )

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Petitioner Starke A. Hawkins, through counsel, moves under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. Upon careful review of the entire record, the Court **REPORTS** and **RECOMMENDS** the § 2255 motion be **DENIED**, this civil action be **CLOSED**, and a final judgment be **ENTERED** in favor of Respondent.

## I.      BACKGROUND

### A.      Investigation and Indictment

On June 6, 2012, a grand jury in this District charged Petitioner with two counts of Receipt of Child Pornography, one count of Possession of Child Pornography, and one count of Transfer of Obscene Material to a Minor. United States v. Hawkins, CR 112-185, doc. no. 24 (S.D. Ga. June 11, 2012). The charges carried maximum punishments of twenty years on each receipt charge, ten years on the possession charge, and ten years on the transfer charge. Id., doc. no. 26. The indictment followed Petitioner's May 11, 2012 arrest on a complaint alleging possession only. Id., doc. no. 5.

The investigation began in April 2012, when a family friend discovered a thumb drive containing images of child pornography, and images of Petitioner naked, in the driveway of Petitioner's residence in Austell, Georgia, within the Northern District of Georgia. Resp't's Ex. 10, Presentence Investigation Report (PSI), ¶¶ 4-5. On May 7, 2012, agents interviewed Martha Hawkins, Petitioner's wife, and learned Petitioner worked at Fort Gordon as a civilian employee for the Department of Defense, renting a room in Martinez, Georgia during the week. PSI ¶ 7; Resp't's Ex. 2. Fort Gordon and Martinez are in the Southern District of Georgia. Mrs. Hawkins reported that two young girls stayed at the Martinez home and spent time with Petitioner every day after school. Resp't's Ex. 2. Mrs. Hawkins previously found messages on Petitioner's phone with a girl approximately ten or eleven years old, and photos on Petitioner's camera of the same girl posing provocatively. Id. Mrs. Hawkins shared a desktop computer in Austell with Petitioner, but Petitioner also owned a laptop only he used. Id.

On the thumb drive, agents found Internet chats ("ICQ chats") between Petitioner and "Art," later described by Petitioner as a sixteen-year-old girl with whom he had communicated for approximately two years. PSI ¶ 6; Resp't's Exs. 1, 4. During these ICQ chats, Petitioner and Art shared child pornography and exchanged lewd messages about the pornography. PSI ¶ 6; Resp't's Ex. 1. The chats appear from their content to have occurred during weekdays while Petitioner was in Martinez, referencing for example Petitioner's work schedule, his workload the next day, and when he arrived and returned home from work. Resp't's Ex. 1, pp. 7, 10.

Reasoning Petitioner used his laptop to download the ICQ chats and child pornography onto the thumb drive, investigators determined the laptop would be in Petitioner's rented room or vehicle in Martinez and sought a search warrant in the Southern

2

District of Georgia. Resp't's Ex. 8, Aff. in Support of Search Warrant, ¶¶ 23-24. The search warrant, obtained on May 10, 2012, authorized a search of Petitioner, the Martinez house, and his vehicle. Id., Search and Seizure Warrant.

The warrant contained a technical error that apparently no one noticed until Petitioner retained habeas counsel. The warrant was accompanied by a warrant application, a supporting affidavit, and two attachments labeled A and B that followed the affidavit. Attachment A described the premises and vehicle to be searched, while Attachment B described the items to be seized. Id., Aff. in Support of Search Warrant. Under the section for describing the items to be seized, the warrant mistakenly incorporated Attachment A rather than Attachment B. Id., Search and Seizure Warrant.

After obtaining the warrant, agents searched the Martinez residence on May 11, 2012, finding Petitioner's laptop with 535 still images and three videos of child pornography. PSI ¶¶ 8, 13. On the same day, agents spoke with Petitioner and he admitted to (1) receiving child pornography in both Austell and Augusta; (2) spending time alone in his Martinez room with girls ages six and ten years old; and (3) engaging in ICQ chats with Art, a teenage girl, and exchanging child pornography with her. Resp't's Ex. 4. Petitioner identified pictures from the thumb drive, including one of his erect penis shared with someone he does not recall which is similar to pictures he shared with children. Resp't's Exs. 4, 7.

Also on May 11, 2012, agents interviewed the mother of the two girls who spent time alone with Petitioner in his Martinez room. Resp't's Ex. 5. The girls were constantly with Petitioner in his room, often with the door closed and sometimes locked. Id. The mother took a phone away from one girl because she was texting with Petitioner too much. Id. One girl recently had unexplained bruising on her hips and legs, and the other girl complained of pain in her stomach and private areas, the latter of which was red with two small bumps. Id.

On that same day, May 11, 2012, agents obtained an arrest warrant and Petitioner made his first court appearance. CR 112-185, doc. nos. 6-9. The Court conducted a preliminary and detention hearing on May 16, 2012. Court-appointed counsel represented Petitioner, and the Court heard testimony concerning the investigation and Petitioner's confession during his interview. Id., doc. no. 48 ("Prelim. Hr'g"). The hearing testimony further revealed that, prior to the agents' interview of Petitioner and execution of the warrant, the agents gave Petitioner the search warrant, application, and affidavit with attachments and provided him with all the time he needed to review these documents. Id. at 13, 21, 38-39. The Court found probable cause to have the matter presented to the grand jury and ordered Petitioner detained. CR 112-185, doc. nos. 18, 20. After the hearing, Petitioner retained Mr. Travis Saul. Id., doc. no. 21.

### B.     Guilty Plea

Mr. Saul filed eight pretrial motions and received an extension of the deadline so he could study the preliminary hearing transcript and determine whether there was a basis for moving to suppress any evidence. Id., doc. nos. 35-44. Mr. Saul did not file any additional motions, and United States District Judge J. Randal Hall scheduled the pretrial conference for October 29, 2012. Id., doc. no. 54.

Petitioner signed a plea agreement on September 18, 2012, admitting he received child pornography within the Southern District of Georgia as alleged in Count One, and formally changed his plea on this count to guilty on October 10, 2012. Id., doc. nos. 56-58. The government agreed to dismiss the remaining three charges, not object to a two-point reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility, and to move for an additional one-point reduction. Id., doc. no. 58, pp. 2-3.

At the change of plea hearing, Judge Hall reviewed the four charges and confirmed Petitioner wanted to plead guilty to Count One, Receipt of Child Pornography. Id., doc. no. 70 ("Rule 11 Tr."), pp. 4-6. Judge Hall also explained the rights Petitioner would be waiving by pleading guilty, and Petitioner affirmed he clearly understood those rights. Among the rights explained, Judge Hall reviewed the right to trial by jury, the presumption of innocence, the government's burden to prove guilt beyond a reasonable doubt, the right to present and cross-examine witnesses, and the right to remain silent. Id. at 9-11.

Judge Hall also explained the penalty for Count One is a term of not less than five or more than twenty years imprisonment, along with a fine of not more than $250,000, and supervised release of five years to life. Id. at 14. Judge Hall explained the role of the sentencing guidelines, and Petitioner stated no one had made any promise, prediction, or prophesy of a particular sentence. Id. at 15-17. Petitioner stated that no one had threatened, forced, or pressured him to plead guilty, and no promises other than those in the plea agreement had been made to convince him to plead guilty. Id. at 3, 14.

FBI Special Agent Brian Ozden provided the factual basis for the plea. The investigation began in the Northern District of Georgia but expanded to the Southern District of Georgia when Mrs. Hawkins informed agents Petitioner worked at Fort Gordon and lived in Martinez during the week. Id. at 19-24. SA Ozden described Petitioner's cooperative and polite manner, and his candid admissions of online chats and exchanges of child pornography with a fourteen-year-old. Id. at 21, 22. Petitioner agreed with SA Ozden's testimony, admitted an addiction to child pornography, and said he was ashamed of his actions. Id. at 23. Judge Hall accepted the guilty plea, finding it to be voluntary and knowing. Id. at 24-25.

## C.     Sentencing

The PSI described Petitioner's service in the United States Army, Somalian combat in 1993, honorable retirement in 1995, treatment for PTSD in 2005, and employment as a project manager at Fort Gordon since 2011.  PSI ¶¶ 39, 43, 46, 49, 50.  Based on a Total Offense level of thirty-seven and a Criminal History Category of I, the PSI calculated an advisory Guideline range of 210 to 262 months, reduced on the top end by the statutory maximum to 240 months.  PSI ¶¶ 55, 56.  The PSI identified Petitioner's military record, charitable service, and good works as potential grounds for departure.  PSI ¶ 68.  Petitioner did not file any objections to the PSI.

During the June 19, 2013 sentencing hearing, Mr. Saul emphasized Petitioner's good character and cooperation with law enforcement, clean criminal history, family circumstances, employment history, advanced age, military service, combat time in Somalia, PTSD, and mental and physical issues - including depression, high blood pressure, coronary heart disease, and an abnormal blood disorder - requiring fourteen medications per day. CR 112-185, doc. no. 69 ("Sent. Tr."), pp. 3-11, 16, 19, 21.  Mr. Saul presented character letters from family and friends attesting to Petitioner's good qualities and seeking leniency. Id. at 11-16.  Petitioner apologized, expressed shame, identified PTSD as a partial cause of his behavior, and said his combat service caused ongoing mental issues.  Id. at 24-26.

The government pointed out the significant benefit to Petitioner of the plea agreement, which limited Petitioner's sentencing exposure to the statutory twenty-year maximum for the one charge to which he pled.  Id. at 29-30.  The government discussed a secret Facebook page Petitioner utilized to exchange messages with underage girls, and reminded the Court of the significant time Petitioner spent alone with two girls in his

Martinez room. Also, a Guideline enhancement applied because Petitioner shared child pornography over the internet with a child, and images attributed to him depicted bondage, bestiality, and penetration of prepubescent children. Id. at 28-32; see also PSI ¶¶ 20-24.

Judge Hall reviewed the serious societal impact of child pornography and recognized the Guidelines reflect that seriousness. Sent. Tr. 34-35. Judge Hall acknowledged Petitioner's military service and the causal link between combat and chronic mental problems. Id. at 36, 38, 39. Judge Hall pointed out Petitioner's crimes went beyond viewing child pornography to include chatting and sharing images with children. Id. at 36. Weighing the relevant factors, Judge Hall sentenced Petitioner at the bottom of the range to 210 months in prison and twenty years of supervised release. Id. at 38-39; CR 112-185, doc. no. 66. Consistent with the waiver in his plea agreement, Petitioner filed no appeal.

### D. § 2255 Proceedings

Petitioner claims he received ineffective assistance of counsel in three ways:

(1) Mr. Saul failed to file a motion to suppress, provide any advice concerning the allegedly defective search warrant, or even discuss the warrant with Petitioner, resulting in the entry of a guilty plea that was not knowing and voluntary;

(2) Mr. Saul failed to adequately explain the provision of Petitioner's plea agreement whereby he waived the right to collaterally attack his conviction and sentence; and

(3) Mr. Saul did not adequately investigate and present information in mitigation at sentencing about Petitioner's PTSD.

(See generally doc. nos. 1, 2.) Respondent invoked Petitioner's collateral attack waiver, but retracted and briefed Grounds One and Three while noting that addressing the merits of these two grounds would moot Ground Two. (Doc. no. 18, p. 11 n.5.) The Court agreed Ground Two is moot, conducted a hearing concerning Ground One, and found no hearing necessary

as to Ground Three. The hearing on June 9, 2015 included testimony from Mr. Saul, Petitioner, Mrs. Hawkins, and SA Ozden.

### 1. Testimony of Mr. Saul

By the time Petitioner retained him in 2012, Mr. Saul had five years of experience as a state prosecutor and ten years of experience as a criminal defense attorney in federal and state courts. CR 112-185, doc. no. 110 ("Evid. Hr'g"), p. 25. The government's initial discovery package included a report from Petitioner's interview on May 11, 2012, describing Petitioner's admissions he (1) chatted online from his Martinez room with teenager Art and exchanged child pornography with her; (2) received child pornography through his Flickr account; (3) shared with children a picture of his erect penis; and (4) created the thumb drive by downloading images and chats from his laptop. Evid. Hr'g 98-108; Resp't's Exs. 1, 4, 7. The government also produced a summary of the interviews with Mrs. Hawkins and the mother of the two young girls who spent time with Petitioner in his room in Martinez. Evid. Hr'g 109; Resp't's Exs. 2, 5. Mr. Saul reviewed a transcript of Petitioner's May 16, 2012 detention and preliminary hearing, as part of his effort to identify any basis for moving to suppress evidence. Id. at 55, 59, 117.

Mr. Saul also received the search warrant, application, and supporting affidavit, and Attachments A and B, all of which appeared as a package in sequentially, Bates-numbered pages. Id. at 95-96; Resp't's Ex. 8, USAO 000036-000055. Mr. Saul read the affidavit establishing probable cause, and Attachments A and B describing the residence to be searched and items to be seized. He did not notice the technical error discovered by Petitioner's habeas counsel, i.e., that the warrant incorporated Attachment A rather than

Attachment B for a description of the items to be seized.  Evid. Hr'g 34.  Mr. Saul explained as follows:

> Again, when I went through the search warrant . . . I saw the affidavit establishing probable cause.  I saw the exhibit detailing or describing the residence that he searched.  I saw the exhibit describing the property to be seized.  So I saw all those things in the search warrant, and, again, I did not notice where instead of saying "B" [the warrant] said "A" as far as the exhibit.

Id.

Mr. Saul reviewed the discovery with Petitioner, and Petitioner confirmed he had, in fact, committed the criminal acts detailed in his interview statements and confirmed by the evidence found on his laptop and thumb drive.  Id. at 120.  Petitioner was remorseful and wanted to cooperate with authorities.  Id. at 98-99, 121; Pet'r's Ex. 14.

Mr. Saul discussed with Petitioner the possibility of moving to suppress the search warrant evidence and Petitioner's interview statements.  Mr. Saul did not identify any particular basis for challenging the search warrant, but instead explained generally they could challenge the warrant and might be successful.  Evid. Hr'g 35.  Mr. Saul explained he could seek suppression of the interview statements based on Petitioner's assertion he was in custody but not Mirandized, although SA Ozden contradicted this assertion.  Id. at 67, 70.  Mr. Saul further explained to Petitioner that, even if he prevailed on a motion to suppress, the case would likely still move forward to trial because of other evidence.  Id. at 35, 67, 118.  If the Court suppressed the search warrant evidence, the government would still be able to use the flash drive.  Id. at 35, 118.  Likewise, if the Court suppressed the interview, the government would still have the flash drive and perhaps the laptop.  Id. at 67.

Sentencing strategy was also at the forefront of Mr. Saul's discussions with Petitioner.  Mr. Saul advised that suppressed evidence could still be used against Petitioner in calculating

his sentencing range under the Guidelines. Id. at 119. Mr. Saul was also mindful of Petitioner's remorseful demeanor and desire to cooperate, and filing a motion to suppress could jeopardize Petitioner receiving a full three-point reduction for acceptance of responsibility. Id. at 121-23. Moreover, Mr. Saul and Petitioner discussed that entry of a guilty plea would allow Mr. Saul to argue at sentencing for a downward variance based on Petitioner's mental health, military service, age, and cooperative nature. Id. at 132-33.

Understanding these variables, Petitioner, an intelligent and communicative client, expressed to Mr. Saul that he "wanted to cooperate" and "didn't . . . have really any interest in challenging the evidence as far as that he knew he had done wrong. . . ." Id. at 35, 67 115-16, 119, 144; see also Resp't's Ex. 4. Importantly, if Mr. Saul had noticed the technical warrant error and recommended moving to suppress on that basis, he would have still advised Petitioner the government would likely proceed to trial even if they prevailed on the suppression motion because the government would still have evidence such as the flash drive. Evid. Hr'g 33, 35, 76, 97, 139, 144.

## 2. Testimony of Petitioner

Petitioner acknowledged he signed the plea agreement after reviewing it with Mr. Saul, and he was not pressured, coerced, or threatened into the guilty plea. Evid. Hr'g 207-08. Petitioner understood at that time the nature of the charges and benefits of pleading guilty, including that pleading guilty to one count with three counts dismissed lowered his sentencing exposure compared to a conviction at trial on multiple counts. Id. at 208-10, 213.

According to his sworn § 2255 motion, Petitioner would have insisted on filing a motion to suppress and going to trial had Mr. Saul identified the technical warrant error. (Doc. no. 1, pp. 3, 6.) Petitioner was more circumspect at the hearing, testifying he "would

*probably* not have accepted the plea, *might* have went [sic] to trial." Evid. Hr'g 195, 200 (emphasis added). A motivation for going to trial in that context would be to preserve an appeal of any adverse ruling on the suppression motion. Id. at 200-01.

While Mr. Saul never mentioned the technical warrant error, he discussed with Petitioner the merits of moving to suppress the incriminating interview statements on the basis Petitioner was not Mirandized. Id. at 193, 195. Petitioner decided to plead guilty because it would reduce his sentence, understanding Mr. Saul's point that the government would still have the incriminating thumb drive even if the Court suppressed the interview statements. Id. at 201-03, 205, 209-210, 215. Indeed, in the context of asserting he has always questioned why Mr. Saul did not move to suppress the interview statements, Petitioner testified as follows:

> Q.      Okay. Do you remember what [Mr. Saul] told you?
>
> A.      Basically, when I brought that up he says, "We could bring it up. We might get it suppressed, but it really is not going to matter because they still have the thumb drive."
>
> Q.      Okay. So with that advice, you decided to go ahead and plead guilty?
>
> A.      Yes, ma'am.
>
> Q.      Because it would reduce your sentence?
>
> A.      Yes ma'am.

Id. at 214-15.

### 3.      Testimony of Mrs. Hawkins

Mr. Saul never mentioned the marital privilege to Mrs. Hawkins, but she would have nevertheless refused to testify if called by the government. Id. at 174. Notably, during the

criminal proceeding, Petitioner questioned Mr. Saul about the effect of a marital separation agreement. Pet'r's Ex. 3.

### 4. Testimony of FBI Special Agent Ozden

SA Ozden executed the affidavit in support of the search warrant application, and he participated in execution of the warrant. Evid. Hr'g 221, 223. SA Ozden knew Attachments A and B followed the affidavit, understood those attachments defined the property to be searched and items to be seized, and governed himself accordingly during execution of the warrant. Id. at 223-24.

There was child pornography on the thumb drive, and the ICQ chats on the thumb drive confirmed Petitioner knew he was receiving child pornography. Id. at 228, 230. Because agents had not fully analyzed the laptop at the time of Petitioner's indictment, they utilized the dates of the ICQ chats to determine the dates specified in the Indictment. Id. at 231-33. Because agents knew Petitioner was living in Augusta during the week and the ICQ chats referenced work, the government had reason to believe Petitioner committed the offenses in the Southern District of Georgia. Id. at 252-53; Resp't's Ex. 1.

There were other leads never pursued due to Petitioner's guilty plea, and the investigation absolutely would have continued until trial. Evid. Hr'g 234. A continuing investigation would have included additional interviews, learning more about Petitioner's secret Facebook page with "friends" who were young girls, and investigating a webpage Petitioner admittedly used for sexual conversations with girls. Id. at 234-35.

## II.    DISCUSSION

Ground Two of the § 2255 motion, alleging inadequate explanation by counsel of the collateral attack waiver, is moot because Respondent has abandoned reliance on that waiver. The Court considers the merits of Grounds One and Three below.

### A.    Ground One Should Be Denied Because Mr. Saul's Failure To Identify The Technical Warrant Error Was Neither Constitutionally Deficient Nor Prejudicial.

All ineffective assistance of counsel claims are subject to the two-part test enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  See Massaro v. United States, 538 U.S. 500, 505 (2003); United States v. Armstrong, 546 F. App'x 936, 940 (11th Cir. 2013). Petitioner must show that counsel was constitutionally ineffective under the two prongs of Strickland by proving defense counsel's performance was deficient and prejudicial.   As explained in the sections below, an evidentiary hearing was necessary to determine the nature of the legal advice by Mr. Saul and the reasons Petitioner decided to plead guilty. Considering the entire record, the Court concludes Mr. Saul's performance as defense counsel was neither deficient nor prejudicial.

### 1.    Ground One Required an Evidentiary Hearing.

A claim of ineffective assistance of counsel when deciding whether to enter a guilty plea cannot be waived and will be addressed on the merits to ensure the knowing and voluntary nature of the entirety of the guilty plea.  See, e.g., Wofford v. Wainwright, 748 F.2d 1505, 1508 (11th Cir. 1984) (stating accused who has not received reasonably effective assistance from counsel in deciding to plead guilty cannot be bound by plea).  Because Petitioner alleges he received deficient advice from Mr. Saul when deciding to whether enter a guilty plea, an evidentiary hearing was necessary to consider all information concerning

Petitioner's decision to plead guilty. United States v. Puentes-Hurtado, 794 F.3d 1278, 1285 (11th Cir. 2015). Indeed, the Eleventh Circuit has repeatedly ruled that discussions between a defendant and counsel about the decision-making process on whether to accept a plea agreement are crucial to resolving ineffective assistance claims. Id.; Davidson v. United States, 213 F. App'x 769, 770-71 (11th Cir. 2007). Thus, the Court rejects outright Petitioner's contention that "any discussions Mr. Saul may have had with [Petitioner] about the warrant are marginally relevant, at best." (Doc. no. 39, p. 9 n.3.)

Respondent incorrectly argues Petitioner's guilty plea forecloses consideration of Ground One pursuant to United States v. Broce, 488 U.S. 563, 569 (1989). The Broce Court applied the longstanding rule that, once a guilty plea becomes final, a habeas petitioner may only challenge the knowing and voluntary nature of the plea, unless the record demonstrates the sentencing court lacked the power to enter the conviction or impose the sentence. In Broce, "there [were] no allegation[s] that counsel was ineffective." 488 U.S. at 566.

## 2. The Deficiency Prong of Strickland Is Highly Deferential when the Habeas Petitioner Has Pled Guilty.

Under the deficiency prong, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. "A petitioner must overcome a strong presumption of competence, and the court must give significant deference to the attorney's decisions." Hagins v. United States, 267 F.3d 1202, 1204-05 (11th Cir. 2001). It is not enough to show ignorance of the law. Harich v. Dugger, 844 F.2d 1464, 1470 (11th Cir. 1988) (en banc), partially overruled on other grounds, Davis v. Singletary, 119 F.3d 1471, 1481-82 (11th Cir. 1997). "Petitioner must prove that the approach taken by defense counsel would not have been used by professionally competent counsel." Id. The purpose of this review is not to grade counsel's performance because, of

course, every lawyer "could have done something more or different. . . . But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*). Strategic decisions are entitled to a "heavy measure of deference." Strickland, 466 U.S. at 691.

"Given the strong presumption in favor of competence, the petitioner's burden of persuasion – though the presumption is not insurmountable – is a heavy one." Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citation omitted). "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer . . . could have acted, in the circumstances, as defense counsel acted . . . ." Ward v. Hall, 592 F.3d 1144, 1164 (11th Cir. 2010) (citing Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (*en banc*)). The Court must resist "using the distorting effects of hindsight and must evaluate the reasonableness of counsel's performance from counsel's perspective at the time." Chandler, 218 F.3d at 1316; see also Waters, 46 F.3d at 1514 ("The widespread use of the tactic of attacking trial counsel by showing what might have been proves that nothing is clearer than hindsight – except perhaps the rule that we will not judge trial counsel's performance through hindsight.")

The impact of a guilty plea on the deficiency analysis is substantial both with respect to the scope and nature of the inquiry. As to scope, the Supreme Court explained as follows:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in McMann [v. Richardson, 397 U.S. 759 (1970)].

> . . . [I]t is not sufficient for the criminal defendant seeking to set aside such a [guilty] plea to show that his counsel in retrospect may not have correctly apprised the constitutional significance of certain historical facts. . . .
>
> . . . Often the interests of the accused are not advanced by challenges that would only delay the inevitable date of prosecution, or by contesting all guilt. A prospect of plea bargaining, the expectation or hope of a lesser sentence, or the convincing nature of the evidence against the accused might well suggest the advisability of a guilty plea without elaborate consideration of whether pleas in abatement . . . might be factually supported.

Tollett v. Henderson, 411 U.S. 258, 267-68 (1973).

As to nature of the inquiry, "counsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial . . . ." Stano v. Dugger, 921 F.2d 1125, 1151 (11th Cir. 1991) (*en banc*) (quoting Wofford, 748 F.2d at 1508). When a client pleads guilty, defense counsel "need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial." Id.; see also Carter v. United States, 288 F. App'x 648, 649 (11th Cir. 2008). Counsel can impart such an understanding by offering his informed opinion on the best choice after examining the facts, circumstances, pleadings, and laws at issue. Wofford, 748 F.2d at 1508. Because no absolute rules dictate reasonableness, counsel has no duty to investigate particular facts or defenses. Chandler, 218 F.3d at 1317. "A tactical decision is ineffective only if it was so patently unreasonable that no competent attorney would have chosen it." Davidson v. United States, 213 F. App'x 769, 770 (11th Cir. 2007). As has been long-settled, "that a guilty plea must be intelligently made is not a requirement that all advice offered by the defendant's lawyer withstand retrospective examination in a post-conviction hearing." McMann, 397 U.S. at 770.

The Supreme Court recently described at length the impact of a guilty plea on the Strickland deficiency analysis in Premo v. Moore, 562 U.S. 115, 125 (2011), when reversing a federal appeals court that found ineffective assistance by counsel who did not file a motion to suppress on behalf of a state defendant who pled guilty. Courts must "respect their limited role in determining whether there was manifest deficiency in light of information then available to counsel." Id. Judicial restraint is critical because "bargains are the result of complex negotiations suffused with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks." Id. at 124. Furthermore, "[t]he absence of a developed or an extensive record and the circumstance that neither the prosecution nor the defense case has been well defined create a particular risk that an after-the-fact assessment will run counter to the deference that must be accorded counsel's judgment and perspective when the plea was negotiated, offered, and entered." Id. at 126.

Because Petitioner pled guilty, his reliance on habeas cases alleging mistakes by counsel at trial misses the mark. See Hinton v. Alabama, 134 S. Ct. 1081, 1089 (2014) (failing to file motion for additional funds to hire competent expert critical for trial); Kimmelman v. Morrison, 477 U.S. 365, 385 (1986) (failing to file timely motion to suppress due to failure to recognize prosecutor's intention to use disputed evidence at trial).

### 3. Mr. Saul's Failure To Identify the Technical Warrant Error As a Basis For Suppression Was Not Constitutionally Deficient.

Applying the Strickland standard, it cannot be said Mr. Saul's performance fell below an objective standard of reasonableness concerning identification of the technical warrant error as a basis for moving to suppress all evidence seized as a result of the warrant. The technical error was anything but a glaring, obvious problem that would have, as Petitioner contends, virtually guaranteed suppression if only Mr. Saul had filed a motion.

The warrant, application, affidavit, and Attachments A and B were presented to Mr. Saul together in one sequential package. Evid. Hr'g 95-96; Resp't's Ex. 8, USAO 000036-000055. Mr. Saul reviewed this package and reasonably determined it established probable cause and particularized through the attachments the places to be searched and property to be seized. Evid. Hr'g 34. SA Ozden made the same determination. He understood Attachments A and B defined the property to be searched and items to be seized, and governed himself accordingly during execution of the warrant. Id. at 223-24. This conclusion shared by Mr. Saul and SA Ozden is reasonable and, more importantly, consistent with controlling precedent in the Eleventh Circuit.

The Eleventh Circuit has long held (1) a warrant may incorporate by reference another document's description of items to be seized; and (2) even if a warrant fails to incorporate by reference, the warrant is still valid so long as the document containing the description is attached to the warrant and accompanies it at the time of execution. See, e.g., United States v. Wuagneux, 683 F.2d 1343, 1350 n. 6 (11th Cir. 1982) (holding affidavit cures ambiguity in items to be seized when incorporated by reference or attached); United States v. Crabtree, No. 14-0288-WS, 2015 WL 631364, at *2-3 (S.D. Ala. Feb. 13, 2015) (explaining warrant may be construed by documents incorporated by reference or attached).

Never mentioning this longstanding rule in the Eleventh Circuit, Petitioner argues the technical warrant error would have unquestionably resulted in suppression under Groh v. Ramirez, 540 U.S. 551, 558 (2004). At issue in Groh was a warrant that did not incorporate any documents for a description of the items to be seized. Instead, in the space designated for this purpose, the warrant merely described a two-story blue house. Groh, 540 U.S. at 554. The supporting application included a detailed description of the items to be seized, but

the warrant did not incorporate by reference the application, and the agent did not provide the homeowner with a copy of the application because it was sealed. Id. at 557-58. Nothing provided to the homeowner contained *any* description of the items to be seized. The homeowner sued the executing agents, and the Supreme Court held the warrant was "plainly invalid" under the Fourth Amendment because it did not contain any description of the items to be seized, and the agents were not entitled to qualified immunity. Id. at 558-59.

> As the Supreme Court described <u>Groh</u> in a more recent decision:

> [W]e held that officers who carried out a warrant-approved search were not entitled to qualified immunity because the warrant in question failed to describe the items to be seized *at all*. . . . [T]he warrant stated nonsensically that "there is now concealed [on the specified premises] a certain person or property, namely [a] single dwelling residence two story in height which is blue in color and has two additions attached to the east." Because "even a cursory reading of the warrant in [that] case - perhaps just a simple glance - would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal," we held that the officer was not entitled to qualified immunity.

<u>Messerschmidt v. Millender</u>, 132 S. Ct. 1235, 1250 (2012) (citations omitted).

Petitioner's case is materially distinguishable because Attachment B particularized the items to be seized and was included in the warrant package executed by SA Ozden and the Magistrate Judge and delivered to Petitioner. Prior to Petitioner's interview on May 11, 2012, agents gave Petitioner the search warrant, application, and affidavit with attachments, and provided Petitioner all the time he needed to review these documents. Prelim. Hr'g 13, 21, 38-39. No reasonable person reviewing these documents could have mistaken the purpose of Attachments A and B. After referencing Attachment A for the locations to be searched, SA Ozden's affidavit explains the warrant seeks authorization to (1) search Petitioner's truck "for the items specified in Attachment B"; and (2) search Petitioner's Martinez residence for "the items specified in Attachment B." Resp't's Ex. 8, Aff. in

Support of Search Warrant, ¶ 2. Attachment B is entitled "LIST OF ITEMS TO BE SEIZED" while Attachment A is entitled "DESCRIPTION OF SEARCH LOCATION." <u>Id.</u>, Attachs. A & B.

Another important distinction is that, in <u>Groh</u>, the Court found typing the phrase "single dwelling residence . . . blue in color" in the space set aside for a description of items to be seized could not be "characterized as a mere technical mistake or typographical error." 540 U.S. at 558. Mistyping "Attachment A" rather than "Attachment B" in the warrant is the essence of a technical mistake or typographical error.

Furthermore, nothing in <u>Groh</u> changes the longstanding rule in the Eleventh Circuit that a description of items to be seized is sufficient so long as it is either incorporated by reference into the warrant or accompanies the warrant at the time of execution. On the contrary, the Supreme Court recognized, and disavowed any intent to supplant, precedent from Courts of Appeals regarding these issues. The Court pointed out "most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." <u>Groh</u>, 540 U.S. at 557-58.

The Court declined to "further explore the matter of incorporation" because the warrant at issue in <u>Groh</u> "did not incorporate other documents by reference, nor did either the affidavit or the application (which had been placed under seal) accompany the warrant." <u>Id.</u> at 558. Thus, while <u>Groh</u> offers an excellent tutorial concerning best practices for warrants, and suggests in *dicta* that a warrant should both incorporate a description by reference and attach the description, it does not supplant Eleventh Circuit precedent allowing incorporation or attachment. <u>See</u> <u>Battle v. Webb</u>, 298 F. App'x 882, 884-85 (11th Cir. 2008) (recognizing

limited holding of Groh, and finding warrant deficient because it neither incorporated nor attached affidavit specifying search location and items to be seized).

Notably, Petitioner also argues the warrant is defective because Attachments A and B were not attached directly to the warrant itself, but instead were attached to the affidavit. The argument elevates form over substance. It is undisputed that the attachments, along with the application and affidavit, accompanied the warrant at every stage including approval by the Magistrate Judge, presentment and review by Petitioner, and execution by the agents. Petitioner has not cited, and the Court cannot find, any decision holding that physical attachment directly to the warrant itself is required.

Another problem Groh presents for Petitioner is its civil context. The Court found agents executing the warrant were not entitled to qualified immunity because the warrant was "plainly invalid" in its complete omission of a description of items to be seized. Id. at 557. The Groh Court had no occasion to consider the criminal context, where there may be a warrant violation but nonetheless a reason to deny suppression such as the good faith exception under United States v. Leon, 468 U.S. 897 (1984). In the Eleventh Circuit, "[t]he good faith exception may be applied to a search conducted pursuant to an overly broad warrant." United States v. Travers, 233 F.3d 1327, 1330 (11th Cir. 2000); see also United States v. Ortiz-Aleman, No. 1:11-CR-0020-ODE-JFK, 2011 WL 3739528, at *6 (N.D. Ga. July 11, 2011) ("[T]he good faith exception to the exclusionary rule applies to alleged violations of the particularity requirement."), adopted sub nom., United States v. Orellana, 2011 WL 3739425, at *1 (N.D. Ga. Aug. 11, 2011).

"The Supreme Court's decision in Leon stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable

reliance upon a search warrant that is ultimately found to be unsupported by probable cause."
United States v. Robinson, 336 F.3d 1293, 1295-96 (11th Cir. 2003) (quotation and citation omitted).  Pursuant to Leon, suppression is necessary "only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." Id. at 1296.

Searches pursuant to a warrant will rarely require any deep inquiry into reasonableness because a warrant issued by a magistrate judge "normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." Leon, 468 U.S. at 922 (quotation and citation omitted).  Nevertheless, "it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." Id. at 922–23.  The Leon good faith exception thus does not apply when: (1) the magistrate judge was misled by information the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) the magistrate judge wholly abandoned his judicial role; (3) the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.  Robinson, 336 F.3d at 1296.

The only possible basis for finding the good faith exception inapplicable here is the fourth.  But as explained in detail above, the warrant package executed by SA Ozden and signed by the Magistrate Judge, and delivered to Petitioner at the time of execution, provides a clear description of the items to be seized in Attachment B.  The mere typographical mistake in the warrant, referencing Attachment A rather than B, does not render the warrant

so facially deficient that the executing officers could not reasonably presume it to be valid. This is especially true since, as explained above, binding Eleventh Circuit precedent holds the warrant is sufficient even when it does not expressly incorporate the description of items to be seized so long as the description is attached to the warrant at the time of execution. Furthermore, it is undisputed that the agents executing the warrant acted in good faith. They understood Attachment B restricted their authority to seize only the items listed therein, and they obeyed these restrictions when executing the warrant. Evid Hr'g 223-24.

For these reasons, the technical warrant error is not a glaring omission that would have assured suppression of the warrant evidence. Far from it, the argument for suppression faced significant obstacles of binding Eleventh Circuit precedent concerning warrant attachments and the Leon good faith exception. Certainly, therefore, not all reasonably competent attorneys would have identified the technical warrant error as a basis for suppression. Furthermore, not all reasonably competent attorneys made aware of the error would have recommended filing a motion to suppress given the obstacles to success, Petitioner's admission of guilt and consistent desire to cooperate, and the adverse impact of moving to suppress on plea negotiations and the range of potential sentences.

To succeed on an ineffective claim in the context of a guilty plea a petitioner must prove "serious derelictions" in counsel's advice regarding the plea. Stano, 921 F.2d at 1150-51. Petitioner has not done so here.

> **4.      There Is No Prejudice Because Petitioner Would Not Have Insisted on Trial Even if Mr. Saul Identified the Technical Warrant Error.**

Under the prejudice prong of Strickland, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to

undermine confidence in the outcome." Strickland, 466 U.S. at 694. A petitioner must affirmatively prove prejudice that would undermine the results of the proceedings because "attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. That the errors had some conceivable effect on the outcome of the proceeding is insufficient to show prejudice." Butcher v. United States, 368 F.3d 1290, 1293 (11th Cir. 2004) (citations and internal quotations omitted). Indeed, the Court must examine the entirety of counsel's performance and the effect of such "in light of the record as a whole to determine whether it was reasonably probable that the outcome would have been different." Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989).

In the context of a guilty plea, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). This standard emphasizes the "fundamental interest in the finality of guilty pleas." Id. at 58. The prejudice determination is not based on whether a petitioner would have ultimately prevailed on the specific issues underlying the ineffectiveness claim, "but instead on whether [a petitioner] would have pleaded guilty had counsel's performance not been deficient." Davidson v. United States, 138 F. App'x 238, 240 (11th Cir. 2005). In particular, "a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." Diveroli v. United States, 803 F.3d 1258, 1263 (11th Cir. 2015) (citing Padilla v. Kentucky, 559 U.S. 356, 372 (2010)).

The Court finds Petitioner would have instructed Mr. Saul to pursue a plea deal and forego a motion to suppress even if Mr. Saul had identified the technical warrant error as a potential basis for a suppression motion. According to his sworn § 2255 motion, Petitioner

would have insisted on going to trial had Mr. Saul identified the technical warrant error. (Doc. no. 1, pp. 3, 6.)  However, Petitioner was more circumspect at the hearing, testifying he "would *probably* not have accepted the plea, *might* have went [sic] to trial."  Evid. Hr'g 195, 200 (emphasis added).  A motivation for going to trial in that context, he explained, would have been to preserve an appeal of any adverse suppression ruling.  Id. at 200-01.

Petitioner's circumspection is reasonable given the remainder of his hearing testimony.  According to Petitioner, while Mr. Saul never mentioned the technical warrant error or the general concept of challenging the warrant, Mr. Saul did discuss with Petitioner the merits of moving to suppress the incriminating interview statements based on Petitioner's averment the agents failed to Mirandize him.  Id. at 193, 195.  Petitioner admitted he nonetheless decided to plead guilty because it would reduce his sentence, understanding Mr. Saul's point that the government would still have the incriminating thumb drive even if the Court suppressed the interview statements.  Id. at 201-03, 205, 209-210, 215.  In the context of asserting he has always questioned why Mr. Saul did not move to suppress the interview statements, Petitioner testified as follows:

> Q. Okay.  Do you remember what [Mr. Saul] told you?
>
> A. Basically, when I brought that up he says, "We could bring it up.  We might get it suppressed, but it really is not going to matter because they still have the thumb drive."
>
> Q. Okay.  So with that advice, you decided to go ahead and plead guilty?
>
> A. Yes, ma'am.
>
> Q. Because it would reduce your sentence?
>
> A. Yes ma'am.

Id. at 214-15.

The best evidence of what Petitioner would have decided if he had considered a motion to suppress the warrant evidence based on the technical warrant error is what he actually decided in the similar context of considering a motion to suppress the interview statements. In both contexts, Petitioner would have sought the suppression of critical evidence, and in both contexts Mr. Saul's assessment would have been the same, *i.e.*, that the government would likely proceed to trial even in the event of suppression because of other available evidence such as the thumb drive. The credible evidence shows Petitioner's decision in the warrant context would have been the same as the decision he made in the interview context, *i.e.*, to forego the suppression motion and negotiate the best plea deal.[1]

This is especially true considering Petitioner's overriding concern with obtaining the lowest possible sentence and that filing a suppression motion might have resulted in losing a three-point reduction for acceptance of responsibility. In arguing there would have been no down side to filing a motion to suppress prior to accepting a plea agreement, Petitioner ignores the possibility of less favorable plea terms offered after a suppression hearing, as well as the possibility of earning only two acceptance of responsibility points. United States v. Membrides, 570 F. App'x 859, 860-61 (11th Cir. 2014).

Mr. Saul's testimony, which the Court finds credible in all respects, provides even stronger support for the Court's finding of no prejudice. While Petitioner alleges Mr. Saul never discussed with him the option of moving to suppress the warrant evidence, Mr. Saul testified unequivocally that he did. Mr. Saul testified that he did not identify for Petitioner

---

[1] "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Williams, 731 F.3d 1222, 1230 (11th Cir. 2013).

any particular basis for challenging the search warrant, but instead explained generally they could challenge the warrant and might be successful. Evid. Hr'g 35. Mr. Saul testified he also explained the option of moving to suppress the interview statements based on Petitioner's assertion he was in custody but not Mirandized, which is consistent with Petitioner's recollection. Id. at 67, 70.

Mr. Saul further explained to Petitioner that, even if he prevailed on a motion to suppress, the case would likely still move forward to trial because of other available evidence, such as the thumb drive containing child pornography and perhaps the laptop. Id. at 35, 67, 118. Importantly, if Mr. Saul had noticed the technical warrant error and recommended moving to suppress on that basis, he would have still advised Petitioner that the government would likely proceed to trial even if they prevailed on the suppression motion because it would still have evidence such as the thumb drive. Id. at 33, 35, 76, 97, 144. The testimony shows Mr. Saul would have offered the same advice whether contemplating a motion to suppress the interview statements or the search warrant evidence.

Mr. Saul also advised Petitioner that suppressed evidence could still be used against him in calculating his sentencing range under the Guidelines. Id. at 119. Mr. Saul was also mindful of Petitioner's remorseful demeanor and desire to cooperate, and filing a motion to suppress could jeopardize a full three-point reduction for acceptance of responsibility. Id. at 121-23. Moreover, Mr. Saul and Petitioner discussed that entry of a guilty plea would allow Mr. Saul to argue, as he did at sentencing, for a downward variance based on Petitioner's mental health, military service, age, and cooperative nature. Id. at 132-33.

Understanding all of these variables, Mr. Saul testified Petitioner stated he "wanted to cooperate" and "didn't . . . have really any interest in challenging the evidence as far as that

he knew he had done wrong . . . ." Id. at 35, 67, 119, 121, 144; see also Resp't's Ex. 4; Pet'r's Ex. 14. Mr. Saul testified Petitioner admitted he committed the criminal acts detailed in his interview statements and confirmed by the evidence on his laptop and thumb drive. Evid. Hr'g 120. Petitioner was remorseful, knew he had done wrong, and wanted to cooperate with authorities. Id. at 121; Resp't's Ex. 4; Pet'r's Ex. 14. It would not have been rational under these circumstances to reject a favorable plea agreement and pursue a questionable motion to suppress that, even if successful, would not have suppressed the entirety of the government's evidence. See Diveroli, 803 F.3d at 1263.

When pressed at the hearing concerning why moving to suppress based on the technical warrant error would have been so important to him, Petitioner stated only that Mr. Saul "might have been able to have done more for me than he did." Evid. Hr'g 199-200. Petitioner attempts to distinguish his decision to not seek suppression of the interview statements from the decision he would have faced concerning a motion to suppress the warrant evidence. The latter context is materially different, Petitioner contends, because (1) a successful motion to suppress the warrant evidence would have also resulted in suppression of his interview statements as fruit of the poisonous tree; and (2) without the interview statements, the government would have been forced to dismiss the case for lack of venue because the remaining evidence, including the thumb drive, contained nothing to prove he committed the crimes alleged in the Indictment in the Southern District of Georgia. There are at least four reasons why these arguments fall far short.

First, the Court finds more credible Mr. Saul's testimony that he specifically discussed with Petitioner the strategy of moving to suppress the warrant evidence, and Petitioner had no interest in doing so. Second, a competent attorney discussing the benefits

and burdens of a suppression motion based on the technical error would have advised that the motion faced major obstacles in light of the weaknesses discussed in section II(A)(3), *supra*.

Third, Petitioner's current argument relies on the creation of an alternative universe that unrealistically (1) binds the government to the information and evidence it possessed early in the case; (2) assumes Petitioner would have destroyed the government's entire case by winning the suppression motion, the poisonous tree argument, and venue argument; and (3) ignores that he has *never* claimed innocence and admitted to Judge Hall, under oath, he received child pornography in the Southern District of Georgia, as charged in Count One. Fourth, even if it were a realistic assessment, which it is not, Petitioner's hindsight analysis is entirely inappropriate. The Supreme Court cautions against allowing such tactics to attack a guilty plea because "the potential for the distortions and imbalance that can inhere in a hindsight perspective may become all too real." Premo, 562 U.S. at 125.

Even if the Court were to join Petitioner in a hindsight alternative universe of evidence that would have been available for the government to use at trial had Mr. Saul moved to suppress the warrant evidence, the Court's universe would look nothing like the rose-colored one constructed by Petitioner. The Court could have denied a motion to suppress the warrant evidence, both on the merits and because of the Leon good faith exception. Petitioner could have lost a motion to suppress the interview statements as well, since a ruling would have likely hinged on a credibility determination between Petitioner and SA Ozden. Petitioner's bid to throw out the warrant evidence, including his interview statements, based on a fruit of the poisonous tree argument might have also failed because of the independent source and inevitable discovery doctrines. See, e.g., Nix v. Williams, 467 U.S. 431 (1984); Wong Sun v. United States, 371 U.S. 471 (1963).

Petitioner is also unreasonable in guessing that the government would not have discovered additional evidence to support its case at trial. Resource saving is one of the major advantages of the plea bargaining process. United States v. Ruiz, 536 U.S. 622, 632 (2002). SA Ozden testified his investigation came to a halt once Petitioner decided to sign a plea agreement, leaving without further development critical leads such as (1) the extremely lewd and descriptive ICQ chats between Petitioner and a female teenager in which child pornography was exchanged; (2) Petitioner's Flickr account where he admittedly received child pornography; (3) the unsupervised time Petitioner spent in his Martinez room with the girls ages ten and six-years old; (4) Petitioner's employment dates, times, and location; and (4) Petitioner's secret Facebook page that excluded his wife but included young girls as friends. Evid. Hr'g 130; Resp't's Exs. 2, 7.

Finally, even if Petitioner succeeded in suppressing all of the warrant evidence and interview statements, he would have still faced a difficult trial because of the images and chats on the thumb drive. Petitioner argues the government would have been unable to prove venue, especially since Mrs. Hawkins would have refused to testify. The argument assumes, of course, that the government would not have found other evidence to support its contention that Petitioner committed the charged offenses during his time in this District from the many leads, itemized above, SA Ozden stopped pursuing when Petitioner decided to plead guilty. It is quite a stretch to say that SA Ozden would not have been able to prove from these leads that Petitioner committed these crimes within this District, especially since Petitioner did, in fact, commit these crimes within this District as he admitted at sentencing. Venue, after all, is a question of fact for the jury to determine. United States v. Snipes, 611 F.3d 855, 866

(11th Cir. 2010). The venue argument is yet another example of Petitioner building a work in hindsight that would have never existed in reality.

In light of Mr. Saul's credible testimony, it is highly unlikely Petitioner would have moved to suppress the warrant evidence had Mr. Saul merely identified the technical warrant error. Mr. Saul discussed with Petitioner in general the potential for moving to suppress the warrant evidence, and Petitioner expressed no interest in doing so. He wanted to plead guilty and cooperate because other evidence would remain for the government to present at trial, such as the thumb drive, even if Petitioner succeeded on a motion to suppress the warrant evidence. In sum, Petitioner has failed to satisfy the prejudice prong of Strickland.

**B.    Petitioner's Guilty Plea Was In All Respects Knowing And Voluntary.**

Petitioner bases his challenge to the knowing and voluntary nature of his guilty plea solely on Mr. Saul's pre-plea advice, and he does not allege any error by the Court during the Rule 11 change of plea hearing. See, e.g., doc. no. 20, pp. 4-5. Petitioner reiterated at the evidentiary hearing he was not pressured to plead guilty and he knew the nature of the charge and penalties. Evid. Hr'g 208-10. The Court reviewed the Rule 11 hearing and agrees.

The court accepting a plea must "specifically address three 'core principles,' ensuring that a defendant (1) enters his guilty plea free from coercion, (2) understands the nature of the charges, and (3) understands the consequences of his plea." United States v. Moriarty, 429 F.3d 1012, 1019 (11th Cir. 2005). After thorough questioning, Judge Hall found Petitioner's decision to plead guilty was free of any coercion. Rule 11 Tr. 3, 14, 25. Judge Hall informed Petitioner of the charge to which he was pleading guilty, and Petitioner testified he understood. Id. at 4-6. Judge Hall explained the rights Petitioner would forfeit by pleading guilty, and Petitioner affirmed he understood. Id. at 9-11. Judge Hall also

explained the five-year minimum and twenty-year maximum statutory sentence for the charge, and Petitioner affirmed he understood. Id. at 14.

Petitioner also admitted under oath he received child pornography as alleged in Count One in the Southern District of Georgia. "[S]olemn declarations in open court carry a strong presumption of verity" and "constitute a formidable barrier in any subsequent collateral proceedings." Blackledge v. Allison, 431 U.S. 63, 74 (1977). Petitioner has never asserted at any time since he did not commit the acts to which he pled guilty. Petitioner thus entered his guilty plea knowingly and voluntarily.

### C. Ground Three Is Bereft Of Detail, Substance, And Merit.

Ground Three alleges Mr. Saul provided ineffective assistance because he "did nothing" with medical records supporting a PTSD diagnosis as mitigation evidence. (Doc. no. 1, p. 5; doc. no. 2, pp. 17-19). Petitioner alleges Mr. Saul should have hired a mental health expert to explain "my condition and the relevance of that condition to the issues the Court had to decide at my sentencing hearing." (Doc. no. 1, p. 5.) Petitioner does not provide any medical records or explain the relevance to mitigation, let alone present the expert opinion Mr. Saul should have obtained. Even after Respondent identified the conclusory nature of Ground Three, Petitioner's reply brief failed to mention this ground. (See doc. no. 20). Conclusory allegations such as those in Ground Three do not warrant a hearing. Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991).

Petitioner has not carried his burden to show Mr. Saul's argument in mitigation regarding PTSD fell below an objective standard of reasonableness or that Petitioner suffered prejudice. Indeed, there are at least three reasons why it is clear Mr. Saul effectively argued this point in mitigation to Petitioner's benefit rather than his prejudice. First, the contention

Mr. Saul "did nothing" with the records is incorrect. He argued at sentencing for a reduced sentence based on Petitioner's PTSD, (Sent. Tr. 8-9, 16, 21), and he used Petitioner's mental health records during plea negotiations. Evid. Hr'g 42. Second, the PSI contained a detailed personal history of Petitioner including his military service, his 1993 combat in Somalia, and his 2005 treatment for PTSD. PSI ¶¶ 39, 43, 46, 49. Third, and most importantly, Judge Hall acknowledged Petitioner's military service and combat in Somalia, he recognized the causal connection between military service and mental illness, and he considered Petitioner's military service and PTSD when imposing a sentence at the bottom of the Guideline range. Sent. Tr. 36, 38-39. Petitioner is thus not entitled to relief on Ground Three.

## III.    CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** the § 2255 motion be **DENIED**, this civil action be **CLOSED**, and a final judgment be **ENTERED** in favor of Respondent.

SO REPORTED and RECOMMENDED this 12th day of May, 2016, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA